IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 05-cv-00018-RPM-CBS

FORT PECK HOUSING AUTHORITY,

        Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,
ALPHONSO JACKSON, Secretary of Housing and Urban Development, and
MICHAEL LIU, Assistant Secretary for Public and Indian Housing.

        Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Matsch, Senior Judge

      The plaintiff, Fort Peck Housing Authority ("FPHA"), is an agency of the federally

recognized Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation.  FPHA is

authorized as a Tribally Designated Housing Entity ("TDHE") to receive annual block grant funds

from the United States Department of Housing and Urban Development ("HUD") pursuant to the

Native American Housing Assistance and Self-Determination Act of 1996, 25 U.S.C. § 4101 *et

seq.*  ("NAHASDA"), and administer those funds to provide affordable housing for low income

families.  FPHA brought this action for judicial review under the Administrative Procedure Act, 5

U.S.C. §§ 701-706 ("APA"), of HUD's determinations that FPHA has

received excess block grant funding for the years 1998 through 2002 and that FPHA must repay

the overfunded amounts.

The agency action under review is a letter dated March 26, 2004, from Assistant Secretary Michael Liu to counsel for FPHA.  A.R. 531-534.[1]  That letter incorporates a letter of January 3, 2003, from Rodger J. Boyd, Deputy Assistant Secretary for Native American Programs, outlining HUD's legal interpretation of the statutes and implementing regulations.  A.R. 380-384.  The core of the plaintiff's complaint is that the regulations conflict with the statute and are therefore invalid.

Before the enactment of NAHASDA, HUD provided funds to Indian housing authorities through a variety of programs under the United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.*  HUD provided funding for low-rent housing projects and assistance to tenants under section 8 of that Act.  *See* 42 U.S.C. § 1437f.  HUD also provided assistance through programs designed to assist low-income Indian families in purchasing homes.

 Under a homeownership program known as Mutual Help, an eligible Indian family could contribute land, work, cash, materials or equipment to the construction of a home under a Mutual Help and Occupancy Agreement with an option to purchase the home at the end of the contract period.  *See* 24 C.F.R. Part 905, Subpart E (1995); *see also Dewakuku v. Martinez*, 271 F.3d 1031, 1034 (Fed. Cir. 2001) (describing the Mutual Help program and explaining that "the family enters into what is, in essence, a lease-purchase agreement, for a period of up to twenty-five years").

Another program designed to encourage homeownership was the Turnkey III Homeownership Opportunities program.  Turnkey III was also a type of lease-to-own program.

---

[1]Documents included in the Administrative Record are Bates-stamped, and references are to the Bate-stamped page numbers.  For example, A.R. 531 refers to the page in the record marked US 000531.

*See* 24 C.F.R. Part 905, Subpart G (1995); *see also* Michael H. Schill, *Privatizing Federal Low Income Housing Asssitance: The case of Public Housing,* 75 CORNELL L. REV. 878, 913-14 (May 1990) (explaining that the Turnkey III program "permitted tenants to purchase newly built public housing when their accumulated rent payments equalled the development cost of the unit or when they received sufficient mortgage financing"). HUD's regulations permitted conversion of either Turnkey III units or Mutual Help units into rental units. *See* 24 C.F.R. §§ 905.458, 905.503(a)(1995).

HUD's housing assistance to tribes under the 1937 Housing Act was provided through Annual Contributions Contracts ("ACC"). *See* 24 C.F.R. § 1000.10(b) (defining Annual Contributions Contract as "a contract under the 1937 Act between HUD and an IHA [Indian Housing Authority] containing the terms and conditions under which HUD assists the IHA in providing decent, safe, and sanitary housing for low-income families."). HUD awarded funds for each fiscal year in the specific amount set forth in the ACC for that year.

NAHASDA was enacted in 1996, and took effect on October 1, 1997. *See* Pub. L. 104-330, § 107, 110 Stat. 4016 (1996).[2] The legislative purpose of NAHASDA is articulated in the Congressional findings set forth in 28 U.S.C. § 4101:

> (1) the Federal Government has a responsibility to promote the general welfare of the Nation–
>
>> (A) by using Federal resources to aid families and individuals seeking affordable homes in safe and healthy environments and, in particular, assisting responsible, deserving citizens who cannot provide fully for themselves because of temporary circumstances or factors beyond their control;

_____

[2]Section 107 states, "Except as otherwise expressly provided in this Act, this Act and the amendments made by this Act shall take effect on October 1, 1997. 110 Stat. 4016, 4030.

(B) by working to ensure a thriving national economy and a strong private housing market; and

(C) by developing effective partnerships among the Federal Government, State, tribal, and local governments, and private entities that allow government to accept responsibility for fostering the development of a healthy marketplace and allow families to prosper without government involvement in their day-to-day activities;

(2) there exists a unique relationship between the Government of the United States and the governments of Indian tribes and a unique Federal responsibility to Indian people;

(3) the Constitution of the United States invests the Congress with plenary power over the field of Indian affairs, and through treaties, statutes, and historical relations with Indian tribes, the United States has undertaken a unique trust responsibility to protect and support Indian tribes and Indian people;

(4) the Congress, through treaties, statutes, and the general course of dealing with Indian tribes, has assumed a trust responsibility for the protection and preservation of Indian tribes and for working with tribes and their members to improve their housing conditions and socioeconomic status so that they are able to take greater responsibility for their own economic condition;

(5) providing affordable homes in safe and healthy environments is an essential element in the special role of the United States in helping tribes and their members to improve their housing conditions and socioeconomic status;

(6) the need for affordable homes in safe and healthy environments on Indian reservations, in Indian communities, and in Native Alaskan villages is acute and the Federal Government should work not only to provide housing assistance, but also, to the extent practicable, to assist in the development of private housing finance mechanisms on Indian lands to achieve the goals of economic self-sufficiency and self-determination for tribes and their members; and

(7) Federal assistance to meet these responsibilities should be provided in a manner that recognizes the right of Indian self-determination and tribal self-governance by making such assistance available directly to the Indian tribes or tribally designated entities under authorities similar to those accorded Indian tribes in Public Law 93-638 (25 U.S.C. 450 et seq.).

NAHASDA terminated Indian housing assistance under the 1937 Housing Act after September 30, 1997, *see* 25 U.S.C. §§ 4181(1), 4182, and provided for annual block grants on behalf of Indian tribes in amounts to be determined by an allocation formula to be established by regulations issued according to a negotiated rulemaking procedure.  *See* 25 U.S.C. §§ 4151, 4152, 4116.  NAHASDA provides that HUD shall make grants on behalf of Indian tribes to carry out affordable housing activities for each fiscal year from an appropriation for that year for tribes that have submitted an Indian housing plan, meeting general statutory requirements, including a statement of needs of low-income Indian families residing in the jurisdiction of the tribes.  25 U.S.C. §§ 4111, 4112.  The tribes may delegate authority to a tribally designated housing entity.  The plaintiff was so designated by the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation.  Affordable housing activities eligible for funding are described in § 4132 as activities "to develop or to support affordable housing for rental or homeownership."  Congress directed HUD to establish a formula to provide for allocating the annual appropriation among Indian tribes by regulations, using the negotiated rulemaking procedure authorized by the Administrative Procedure Act, 5 U.S.C. §§ 561-567.  The formula to be developed by that process must be in accordance with the statutory requirements of 25 U.S.C. § 4152(b), as follows:

> The formula shall be based on factors that reflect the need of the Indian tribes and the areas of the tribes for assistance for affordable housing activities, including the following factors:
>
> > (1) The number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary.
> >
> > (2) The extent of poverty and economic distress and the number of Indian families within Indian areas of the tribe.

(3) Other objectively measurable conditions as the Secretary and the Indian tribes may specify.

A committee composed of forty-eight representatives of Indian tribes and ten HUD representatives developed the formula in the regulations relied on by HUD in making the decision under review.  *See* "Implementation of the Native American Housing Assistance and Self-Determination Act of 1996; Final Rule," 63 Fed. Reg. 12,334 (March 12, 1998).  The regulations are found in Part 1000, Subpart D, of Title 24 of the Code of Federal Regulations.  24 C.F.R. §§ 1000.301 to 1000.340.

The formula has two components:  (1) Formula Current Assisted Stock ("FCAS") and (2) need.  24 C.F.R. § 1000.310.[3]  The FCAS component is based on a tribe's inventory of low-income housing units, which may include low-rent units, Mutual Help and Turnkey III units.  *See* §§ 1000.310; 1000.312, and 1000.314.  The FCAS component is calculated by multiplying each type of unit in a tribe's housing inventory by a subsidy factor.  *See* § 1000.316.  The need component is based on seven criteria, including information derived from census data, such as the number of households in a tribe's population with income below a median income level, and the number of households living without kitchens and plumbing.  *See* §1000.324.  Generally, the amount of annual funding for an Indian tribe is the sum of the FCAS component and the need component, which is subject to a minimum funding amount.  *See* § 1000.328.

The focus of the present dispute is on the FCAS component of the formula.  The regulations provide that the starting point for calculating the FCAS is "Current Assisted Stock,"

---

[3]Hereinafter citations to section numbers refer to Title 24 of the Code of Federal Regulations, unless otherwise designated.

which is the number of housing units for which a tribe was receiving HUD assistance on

NAHASDA's effective date, October 1, 1997:

> Current assisted stock consists of housing units owned or operated pursuant to an [Annual Contributions Contract].  This includes all low rent, Mutual Help, and Turnkey III housing units under management as of September 30, 1997, as indicated in the Formula Response Form.

§ 1000.312.  Under the formula, units that "were in the development pipeline" as of 1997, and

units for which a tribe was receiving assistance under section 8 of the 1937 Housing Act when

their current contract expires and the Indian tribe continues to manage the assistance in a manner

consistent with the Section 8 program are included in FCAS.  § 1000.314.  Section 1000.318

answers the question, "When do units under Formula Current Assisted Stock cease to be counted

or expire from the inventory used for the formula?"  That regulation reads as follows:

> (a)  Mutual Help and Turnkey III units shall no longer be considered Formula Current Assisted Stock when the Indian tribe, TDHE [tribally designated entity], or IHA [Indian Housing Authority] no longer has the legal right to own, operate, or maintain the unit, whether such right is lost by conveyance, demolition, or otherwise, provided that:

> (1) Conveyance of each Mutual Help or Turnkey III unit occurs as soon as practicable after a unit becomes eligible for conveyance by the terms of the MHOA [Mutual Help Occupancy Agreement]; and

> (2) The Indian tribe, TDHE, or IHA actively enforce strict compliance by the homebuyer with the terms and conditions of the MHOA, including the requirements for full and timely payment.

> (b)  Rental units shall continue to be included for formula purposes as long as they continue to be operated as low income rental units by the Indian tribe, TDHE, or IHA.

> (c)  Expired contract Section 8 units shall continue as rental units and be included in the formula as long as they are operated as low income rental units as included in the Indian tribe's or TDHE's Formula Response From.

As discussed above, a Mutual Help Occupancy Agreement ("MHOA") is a lease with an option to purchase contract.  The term of a MHOA generally is not more than 25 years, and at the end of the term, the homebuyer may exercise the purchase option by paying any remaining balance of the purchase price, plus any closing or settlement costs.  *See* A.R., Attachment 3, "Fort Peck Housing Authority Homeownership and Rental Program Admissions and Occupancy Policy, dated May 10, 2001," at 24-30.

HUD initiates the annual allocation process by sending a "Formula Response Form" to the tribes, indicating HUD's intended application of the formula to allocate the tribe's share of the appropriation for all participating tribes.  *See* §§ 1000.302, 1000.332.  The tribe then may disagree in its response.

In October 1997, HUD sent FPHA a Formula Response Form that included HUD's records of the Mutual Help, Low Rent, Turnkey III, and Section 8 units at Fort Peck developed with funding under the 1937 Housing Act.  A.R. 32-36.  Formula Response Forms were sent for the succeeding years in the same manner, resulting in block grants to FPHA of between $5,000,000.00 and $ 6,000,000.00 for the years 1998, 1999, 2000, and 2001.  A.R. 91; 115; 146; and 181.

In 2001, HUD's Office of Inspector General ("OIG") performed a nationwide audit of the NAHASDA program implementation.  *See* Pl.'s ex. 1.[4]  The OIG conducted site visits of seventeen tribally designated housing entities, other than FPHA.  The OIG audit report contained the conclusion that Indian block grant funds had not been properly allocated in previous years

---

[4]On December 28, 2005, the plaintiff submitted eight exhibits which are not part of the Administrative Record.  The defendants consented to the court's consideration of these exhibits.  The supplemental exhibits are referenced by exhibit number and Bates-stamped page number.

because they were based on "housing units that do not qualify as FCAS." *Id.* at 4.  The OIG

criticized HUD for a failure to enforce compliance with 24 C.F.R. § 1000.318, saying: "Since

Mutual Help and Turnkey III programs generally do not exceed 25-years, one can reasonably

expect that some of these units should be paid-off, and the Housing Entities would no longer have

the legal right to own, operate, or maintain these units."  Pl.'s ex. 1 at 18.  The OIG

recommended that the Office of Native American Programs "audit all Housing Entities' FCAS,

remove ineligible units from FCAS, recover funding from Housing Entities that had inflated FCAS

and reallocate the recovery to recipients that were under funded," and "institute control

procedures to insure FCAS accuracy for future years." *Id.*

In September 2001, HUD notified FPHA that it may have received overpayments.  A.R.

215-216.  HUD questioned the eligibility of 238 homeownership units that were included in the

plaintiff's FCAS component for the years 1998, 1999, 2000 and 2001.  HUD did not assert and

has never contended that FPHA intentionally or fraudulently overstated its housing inventory on

its Formula Response Forms.  As previously stated, the plaintiff's housing inventory numbers in

its Formula Response Forms for the years 1998 through 2001 were based on numbers provided

by HUD.

By letters dated December 20, 2001, May 30, 2002, and July 31, 2002, HUD informed

FPHA that FPHA had received overfunding for the fiscal years 1998 through 2002 in the amount

of $1,767, 276.00.[5]  A.R. 239-242; 299-303, and 342-343.  In 2002, FPHA submitted two

---

[5]In a later letter, HUD stated that "the May 30, 2002 correspondence summarized the
total amount of overfunding that HUD sought to recover as $1,825,027 . . . ."  A.R. 493.

payments to HUD totaling $513,354.00.  *See* A.R. 354-355.  On August 30, 2002, HUD notified

FPHA that it still owed $1,253,922.00.  A.R. 354-355.

On October 3, 2002, counsel for FPHA wrote to HUD, challenging HUD's determination

that FPHA had received overpayments and requesting an opportunity to be heard.  A.R. 370.

Rodger J. Boyd, Deputy Assistant Secretary for Native American Programs, responded by letter

dated January 3, 2003.  A.R. 380-384.  That letter explained HUD's policy with respect to

§ 1000.318.  The Assistant Secretary characterized FPHA's challenge as a dispute over data and

stated that such disputes are governed by procedures set forth in 24 C.F.R. §§ 1000.118 and

1000.336.  Those procedures do not provide for a hearing.

Representatives of FPHA and HUD met on January 15, 2003, and continued to

correspond about the tribes' FCAS inventory.  *See* A.R. 390-393.  From April 8 through April 10,

2003, HUD staff visited the Fort Peck Assiniboine and Sioux Tribes, and conducted an on-site

review of the tribes' FCAS stock.  In a letter to FPHA dated December 8, 2003, Deputy Assistant

Secretary Boyd summarized the communications between HUD and FPHA regarding the

overfunding dispute and set forth the results of the site visit.  A.R. 490-504.  During the site visit,

FPHA was able to show that a number of units that were the subject of dispute should be retained

in the tribe's FCAS inventory.  This reduced the amount in dispute by $ 786,996.00.  A.R. 497.

HUD continued to assert that FPHA's housing inventory had been overstated for block grant

purposes.  HUD's position was that any Mutual Help unit not conveyed at the end of the initial

amortization period could not be counted unless FPHA provided a satisfactory reason for the lack

of conveyance.  HUD refused to allow FPHA to retain units in its FCAS inventory by extending

the repayment period for homebuyers who took over the payment schedules of previous

-10-

homebuyers and excluded any unit with a "tenant account receivable" at the end of the period, unless a written repayment agreement was in place or eviction proceedings had been commenced. A.R. 494-495.

The Deputy Assistant Secretary's letter of December 8, 2003, stated that FPHA had received overfunding in the amount of $1,058,992 for fiscal years 1998-2003, and still owed $504,750.00.  A.R. 498 and 515 (clarifying the amount).  That letter states, "We will work with your Tribe to find a suitable way to structure repayment.  This may involve reducing previous and/or future year's funding."  A.R. 498.  The letter notified FPHA of its right to appeal in accordance with § 1000.336(b) and the appeal process outlined in § 1000.118.  A.R. 498.

On January 12, 2004, FPHA's counsel wrote to the Deputy Assistant Secretary, challenging the agency's determination on three grounds.  A.R. 509-513.  FPHA argued (1) that HUD's interpretation of the block grant allocation formula conflicts with NAHASDA; (2) that in seeking repayment from FPHA, HUD did not follow the statutory procedures relating to adverse grant decisions, and (3) that HUD has no authority to recover block grant funds already awarded.

On March 26, 2004, Mr. Michael Liu, the Assistant Secretary for Public and Indian Housing, responded to FPHA's legal counsel and rejected those arguments.  A.R. 531-534. Mr. Liu's letter stated, "my office will continue to work with the Tribes and the [tribally designated housing entity] to establish a repayment schedule for the over-allocated funds."  As previously stated, Mr. Liu's letter of March 26, 2004, is HUD's final decision under review in this action.

The plaintiff requests a judgment "declaring that all Homeownership units under an ACC as of September 30, 1997 must be included in the Plaintiff's FCAS."  Compl. at 8 (Wherefore

clause), ¶ 4.  In the alternative, the plaintiff requests a judgment "declaring that all Homeownership units that have not been conveyed be included in Plaintiff's FCAS."  *Id.*   The plaintiff seeks injunctive relief "prohibiting Defendants from recapturing the disputed amounts by requiring repayment, the reduction or limiting of future funding or any other means based on the disputed Mutual Help homes, and ordering the Defendants to refund the grant amounts it has recaptured."  *Id. ¶* 3.

In the exercise of jurisdiction granted by the APA, this court is to determine whether HUD's reduction of the FCAS component of the plaintiff's block grant funding for the years 1999-2002 was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

As previously discussed, the agency decision is based on § 1000.318 and that regulation conflicts with the plain language of 25 U.S.C. § 4152(b)(1), mandating the inclusion of "[t]he number of low-income housing dwelling units owned or operated at the time [September 30, 1997] pursuant to a contract between an Indian housing authority for the tribe and the Secretary."

"If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984).  The text of the statute makes its meaning is clear.  The use of that word "shall" limits the agency's discretion. Congress expressly directed that the first factor in determining a tribe's need for housing assistance is *the number* of dwelling units for which a tribe was receiving federal assistance when NAHASDA went into effect.  The use of the phrase "the number" is definitive.  The statute leaves no room for the formula to include some, but not all of the number of dwelling units that a tribe

-12-

owned or operated pursuant to an ACC.  For the purpose of determining a tribe's housing needs, the statute mandates that the number of dwelling units that a tribe owned or operated pursuant to an ACC is to be used in the formula, and that number is a floor.  The direction to promulgate implementing regulations is to develop a workable method for quantifying the other factors to be considered under 25 U.S.C. § 4152(b)(2) and (3).

Section 1000.318 has the perverse effect of turning the number of housing units a tribe owned or operated pursuant to an ACC into a ceiling.  Housing units that a tribe acquired or developed after September 30, 1997 (other than ones that were in the "development pipeline" as of that date) and paid for from NAHASDA funds cannot be included in the FCAS inventory.  *See* §§ 1000.312; 1000.314, and 1000.322.  The downward adjustment required by § 1000.318 means that a tribe's FCAS inventory decreases as homeownership units reach the end of the 25-year amortization period, but a tribe's FCAS inventory cannot remain at the 1997 level, even if the tribe builds or acquires new homeownership units to replace ones that have been demolished or conveyed.

The assumption inherent in the invalid regulation is that a tribe must evict the family living in a home ownership unit if they do not purchase their unit at the expiration of the 25 year term. That assumption ignores the requirements in the FPHA Homeownership and Rental Program Admissions and Occupancy Policy ("A & O Policy"), which was approved by HUD and adopted by the FPHA Board of Commissioners.[6]  The A & O Policy recognizes that homebuyers

---

[6]The FPHA Admissions & Occupancy Policy, dated May 10, 2001, is Attachment 3 to the Administrative Record.  Plaintiff's exhibits 4 and 5 are excerpts from revised versions of the A & O Policy.  References herein are to the A & O Policy dated May 10, 2001, unless otherwise designated.

sometimes fall behind in making their payments, and to avoid evictions, the Policy allows payment agreements to be modified. *See* A & O Policy, §§ 10.d and e. If a homebuyer fails to pay amounts due on time, the housing authority may initiate the eviction process, but it must first terminate the MHOA, and that process requires the housing authority to give notice of the reasons for termination and provide the homebuyer with an opportunity to file a grievance. A & O Policy § 10.h. For homebuyers with delinquencies remaining after the expiration of the amortization period, the Policy allows the housing authority to extend the time for repayment of the remaining balance. A & O Policy § 9.d.v.(1).[7] Homebuyers who do pay the entire purchase price within the amortization period still must pay settlement costs to complete the purchase transaction, and upon conveyance, the homebuyers become responsible for costs and liabilities associated with ownership, including insurance, property taxes, and utilities. A & O Policy §§ 9.e and g. Some homebuyers are unable or reluctant to pay these additional expenses of homeownership. In some circumstances, the housing authority may agree to convert a Mutual Help unit to a low rent unit. A & O Policy § 9.m.

The housing needs of people living on an Indian reservation are not reasonably determined by a formula that depends upon whether the families in homeownership units purchase the property or the FPHA evicts them for failure to accept ownership. Section 1000.318 discourages the development of new units because new units developed with NAHASDA funds are not included in a tribe's FCAS inventory. *See* § 1000.322. If a tribe develops new homeownership

---

[7]The FPHA A & O Policy has been amended to permit a five-year repayment schedule. *See* Pl.'s ex. 5 at 52.

units as old ones are conveyed or demolished, the tribe incurs costs associated with owning and

operating such units, but the tribe cannot count the new units in the FCAS component.[8]

The downward adjustment to FCAS required by § 1000.318 operates to the detriment of

tribes that have chosen to operate a large number of homeownership units.  Tribes with many

homeownership units suffer annual decreases in their FCAS components, whereas tribes whose

housing activities are concentrated on operating rental units do not.  As a result, tribes with large

numbers of homeownership units suffer decreases in their share of the annual apportionment, and

tribes with a large percentage of rental units receive a greater share each year.  The proportion of

homeownership and rental units are for the tribes to determine under the policy of self-

determination.

The plaintiff's interpretation of 25 U.S.C. § 4152 is consistent with the last sentence of

section 25 U.S.C. § 4181(a), which was added by amendment in 2000 and states:

> Any housing that is the subject of a contract for tenant-based assistance between the
> Secretary and an Indian housing authority that is terminated under this section shall,
> for the following fiscal year and each fiscal year thereafter, be considered a dwelling
> unit under section 4152(b) of this section.

"Tenant-based assistance" refers to rental assistance provided to tenants under subsection (*o*) of

section 8 of the 1937 Housing Act.  *See* 42 U.S.C. § 1437f(*o*).  That type of assistance is

provided in the form of tenant subsidies, rather than through a subsidy for a specific building.  *See*

*Baker v. Prop. Investors*, 338 F. Supp.2d 321, 323 (D. Conn. 2004) (explaining the difference

between "project-based" and "tenant-based" assistance  under section 8 of the 1937 Housing

Act).  The purpose of the amendment was to remove any question about whether a "contract" for

---

[8]The plaintiff has built or purchased sixty-five new units since the enactment of
NAHASDA.  Pl.'s ex. 7.

tenant-based assistance is the equivalent of a "dwelling unit" for purposes of 25 U.S.C. § 4152(b).

Significantly, the amendment requires that housing that was the subject of tenant-based assistance

is to be included in the formula *in each fiscal year*.  The language of this amendment is consistent

with the plain language of § 4152(b), showing that Congress intended for the allocation formula in

each fiscal year to be based on "*the number* of low-income housing dwelling units" for which a

tribe was receiving federal assistance when NAHASDA went into effect.  Contrary to HUD's

argument, the amendment does not show Congressional approval of those aspects of the

regulatory scheme that were not amended.  Section 4152(b) speaks of "dwelling units," and no

clarification was required to bring homeownership units within the category of "dwelling units."

     As HUD concedes, § 1000.318(a) is inartfully worded.  The OIG's audit report in 2001

was the event that prompted HUD to reevaluate each tribe's FCAS.  Indeed, the record shows

that before the OIG conducted the audit, HUD had not questioned the eligibility of 25-year old

homeownership units listed in FPHA's FCAS inventory, although the age of the units was

apparent from the "date of full availability" column shown on the Formula Response Forms.

     Section 1000.318 is invalid because it conflicts with 25 U.S.C. § 4152.  The fact that the

regulatory scheme was developed through a negotiated rulemaking procedure is of no relevance

to this determination.  Nor does it matter that the formula was not meant to be "set in stone," and

was intended to be reviewed within the first five years.  *See* § 1000.306.  That time period has

long since passed, and this action concerns the current formula.

     The statute is not ambiguous, but even if there were any lack of clarity, the proper

interpretation is one that benefits Indians.  "[S]tatutes are to be construed liberally in favor of the

Indians, with ambiguous provisions interpreted to their benefit."  *Montana v. Blackfeet Tribe*, 471

U.S. 759, 766 (1985).  Interpretation of the statute at issue in this case is governed by that canon of construction, and not by the rule favoring deference to the agency's interpretation.  *See Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461-62 (10th Cir. 1997).  When Congress enacted NAHASDA, it stated that "providing affordable homes in safe and healthy environments is an essential element in the special role of the United States in helping tribes and their members to improve their housing conditions and socioeconomic status. " 25 U.S.C. § 4101(4).  Congress found that "the need for affordable homes and healthy environments on Indian reservations [and] Indian communities is acute." *Id.* § 4101(6).  The plaintiff's interpretation is consistent with the goals of NAHASDA and benefits all tribes by setting a lower limit on each tribe's housing inventory to be counted for the formula.  The plaintiff's interpretation treats all tribes in the same manner, regardless of how a tribe's housing inventory is distributed between rental and homeownership units.  Using a definitive number as a baseline also benefits the tribes by eliminating the bureaucratic burdens and confusion so apparent in this Administrative Record.  Furthermore, Indians benefit from an interpretation that does not discourage tribes from developing new homeownership units to replace older ones that have been demolished or conveyed.

Section 1000.318 is not merely a slight imperfection in the regulatory scheme, it is a serious flaw that cannot be reconciled with the language of 25 U.S.C. § 4152(b).  For the reasons set forth above, HUD's interpretation of 25 U.S.C. § 4152(b) is not reasonable and is not entitled to controlling weight.  Section 1000.318 leads to funding allocations – with reductions to some tribes and windfalls to others –  based on factors that are not related to tribal housing needs.

Even if the statute and the regulation could be reconciled, HUD's interpretation of § 1000.318 results in paternalistic oversight by that agency, contrary to the principles of Indian self-determination and self-governance that are key components of NAHASDA.  *See* 25 U.S.C. § 4101(7).  As set forth above, HUD interprets § 1000.318 (a)(1) and (2) to mean that a tribe is allowed to count homeownership units in its FCAS if the tribe still owns and operates the units, and so long as the tribe (1) is conveying units as soon as practicable after they become eligible for conveyance, and (2) is strictly enforcing its agreements with homebuyers.  As discussed above, the plaintiff's A & O Policy sets forth collection procedures and procedures applicable to conveyance of homeownership units.  HUD should defer to the FPHA's judgment, within the parameters of that Policy, as to when eviction or conveyance is appropriate.  Instead, HUD itself determines whether the tribe has conveyed such units "as soon as practicable," and whether the tribe is strictly enforcing its MHOAs.  HUD's exercise of authority over this determination interferes with tribal management of tribal affairs.  Notably, in response to the OIG audit report, the Deputy Assistant Secretary for Native American Programs protested the OIG's recommendation that HUD take a more active oversight role, explaining that the administration of the Indian Block Grant program should be accomplished "in a manner that recognizes the right of Indian self-determination and tribal self-governance."  *Id.* at 21.

The plaintiff also contends that HUD's actions were taken without observance of the procedural requirements pertaining to NAHASDA compliance audits, and that HUD has no authority to recapture amounts from the the plaintiff that it has already spent on affordable housing activities.  Having resolved the resolved the statutory interpretation issue in favor of the

plaintiff, and having determined that 24 C.F.R. § 1000.318 is invalid, the court need not address the procedural issues addressed in the plaintiff's complaint and the briefs.

Based on the foregoing, it is

ORDERED that the findings and conclusions set forth in Assistant Secretary Liu's letter of March 24, 2004, are set aside; and it is

FURTHER ORDERED that judgment shall enter declaring 24 C.F.R. § 1000.318 invalid, and declaring that all Mutual Help and Turnkey III units that the plaintiff owned or operated pursuant to an Annual Contributions Contract as of September 30, 1997, must be included in the formula for determining its allocation of the annual Congressional appropriation for Indian Housing Block Grants, and it is

FURTHER ORDERED that the defendants shall take such administrative action as necessary to implement this ruling.

Dated: May 25, 2006

BY THE COURT:

s/Richard P. Matsch
_____
Richard P. Matsch, Senior District Judge