IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 05-cv-00018-RPM

FORT PECK HOUSING AUTHORITY,

        Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,
SHAUN DONOVAN, Secretary of Housing and Urban Development, and
DEBORAH A. HERNANDEZ, Assistant Secretary for Public and Indian Housing.

        Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

On January 6, 2005, Fort Peck Housing Authority ("Fort Peck") filed this civil action for

judicial review under the authority of the Administrative Procedure Act ("APA") of the action of

the United States Department of Housing and Urban Development ("HUD"), determining that

Fort Peck had received excess money paid in annual grants pursuant to the Native American

Housing Assistance and Self Determination Act of 1996, 25 U.S.C. § 4101, *et seq.*

("NAHASDA") for the years 1998 through 2002 and must repay the over funded amounts.

The core of the complaint was that HUD's decision, based on a regulation, 24 C.F.R.

§ 1000.318(a), was inconsistent with the statutory requirement in 28 U.S.C. § 4152(b) that set

out the following parameters for the formula to be developed through a negotiated rulemaking

process for the allocation of annual block grants of funds for providing affordable housing for

low income families among Indian tribes:

(1) The number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary.

(2) The extent of poverty and economic distress and the number of Indian families within Indian areas of the tribe.

(3) Other objectively measurable conditions as the Secretary and the Indian tribes may specify.

The time referred to in paragraph (1) was September 30, 1997, the day before the effective date of NAHASDA which replaced the previous practice of funding by contracts under the Housing Act of 1937.

After review of the administrative record this Court agreed with that claim and held the regulation invalid in a Memorandum Opinion and Order dated May 25, 2006.  The judgment entered on that date was modified on June 30, 2006, clarifying that the Court's ruling was limited to Fort Peck.[1]

HUD appealed to the Tenth Circuit Court of Appeals in 2006. While the appeal was pending, Congress enacted the Native American Housing Assistance and Self-Determination Reauthorization Act of 2008 (the "Reauthorization Act," Pub. L. No. 110-411, 122 Stat. 4319 (2008)). Section 301(2) of the Reauthorization Act amended 25 U.S.C. § 4152(b). As amended, § 4152(b) now reads:

(b) Factors for determination of need
The formula shall be based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities, including the following factors:

---

[1]*Fort Peck Housing Auth. v. HUD*, 435 F. Supp. 2d 1125, 1127-28 (D. Colo. 2006) (*Fort Peck I*), *rev'd* 367 Fed. Appx. 884 (10th Cir. 2010) (unpublished) (*Fort Peck II*), *cert. denied*, 131 S.Ct. 347 (2010).

(1)(A) The number of low-income housing dwelling units developed under the United States Housing Act of 1937 (42 U.S.C. 1437 et seq.), pursuant to a contract between an Indian housing authority for the tribe and the Secretary, that are owned or operated by a recipient on the October 1 of the calendar year immediately preceding the year for which funds are provided, subject to the condition that such a unit shall not be considered to be a low-income housing dwelling unit for purposes of this section if–

> (i) the recipient ceases to possess the legal right to own, operate, or maintain the unit; or
> (ii) the unit is lost to the recipient by conveyance, demolition, or other means.

(B) If the unit is a homeownership unit not conveyed within 25 years from the date of full availability, the recipient shall not be considered to have lost the legal right to own, operate, or maintain the unit if the unit has not been conveyed to the homebuyer for reasons beyond the control of the recipient.

(C) If the unit is demolished and the recipient rebuilds the unit within 1 year of demolition of the unit, the unit may continue to be considered a low-income housing dwelling unit for the purpose of this paragraph.

(D) In this paragraph, the term "reasons beyond the control of the recipient" means, after making reasonable efforts, there remain--

> (i) delays in obtaining or the absence of title status reports;
>
> (ii) incorrect or inadequate legal descriptions or other legal documentation necessary for conveyance;
>
> (iii) clouds on title due to probate or intestacy or other court proceedings; or
>
> (iv) any other legal impediment.

25 U.S.C. § 4152(b).

By Order and Judgment, entered on February 19, 2010, a panel of the Tenth Circuit reversed the judgment by concluding that this Court erred in its literal reading of § 4215(b) and holding that § 1000.318 was valid to the extent that it required exclusion of units that the tribe no

longer owned or operated at the time it submitted its Formula Response Forms in the process of determining the annual allocation of funds by HUD.

The appellate court did not determine the validity of HUD's denial of funds for units that were still owned and operated by Fort Peck on HUD's determination that those units should have been conveyed upon the expiration of the period of occupancy under the terms of Mutual Help and Occupancy Agreements ("MHOAs") entered into between the tribe and eligible Indian families.  That court recognized the 2008 amendments in a footnote but did not consider them.

The Reauthorization Act became effective on October 14, 2008. Congress provided that the amendments set forth in Subparagraphs (b)(1)(A) through (D) "shall not apply to any claim arising from a formula current assisted stock calculation or count involving an Indian housing block grant allocation for any fiscal year through fiscal year 2008, if a civil action relating to the claim is filed by not later than 45 days after October 14, 2008." 25 U.S.C. § 4152(b)(1)(E).

Before that deadline, other tribes and tribally designated housing entities filed actions in this court and other courts, alleging claims similar to those alleged by Fort Peck. The following related actions are now pending in this court:

Civil Action No. 05-cv-00018-RPM, *Fort Peck Housing Authority v. HUD*;

Civil Action Number 06cv01680-RPM, *Northern Arapaho Tribe et al. v. HUD*;[2]

---

[2]There are four Plaintiffs in Civil Action No. 06cv01680:  the Northern Arapaho Tribe and Intervenor Plaintiffs Jicarilla Apache Housing Authority, Mescalero Apache Housing Authority, and Ute Indian Tribal Housing. The named defendants, which include HUD and individual HUD officials, are referred to collectively as "HUD."

Civil Action Number 07cv01343-RPM, *Blackfeet Housing et al. v. HUD*;[3]

Civil Action No. 08cv00451-RPM, *Tlingit-Haida Regional Housing Authority v. HUD*;

Civil Action No. 08cv00826-RPM, *Navajo Housing Authority v. HUD*;

Civil Action No. 08cv02570-RPM, *Yakama Nation Housing Authority v. HUD*;[4]

Civil Action No. 08cv02573-RPM, *Modoc Lassen Indian Housing Authority v. HUD*;

Civil Action No. 08cv02577-RPM, *Choctaw Nation of Oklahoma v. HUD*, and

Civil Action No. 08cv02584, *Sicangu Wicoti Awanyakapai Corporation et al. v. HUD*.[5]

Another related action, Civil Action No. 11-cv-01516-RPM, *Nambe Pueblo Housing Entity v. HUD*, was filed on June 10, 2011.

Because there were issues raised by Fort Peck that were not decided by the Order and Judgment and the tribes in the other civil actions in this court had raised common issues, a coordinated conference was held with counsel in all of the cases, resulting in an agreement to file amended or supplemental complaints with coordinated briefing on the common issues raised by those pleadings and the relevant portions of the administrative records.

---

[3]There are ten Plaintiffs in Civil Action No. 07cv01343:  Blackfeet Housing; the Zuni Tribe; Isleta Pueblo Housing Authority; Pueblo of Acoma Housing Authority; Association of Village Council Presidents Regional Housing Authority; Northwest Inupiat Housing Authority; Bristol Bay Housing Authority; Aleutian Housing Authority; Chippewa Cree Housing Authority, and Big Pine Paiute Tribe.

[4]Yakama Nation Housing Authority also filed suit in the United States Court of Federal Claims, where the action is proceeding as Civil Action No. 08-839C. *See Yakama Nation Housing Auth. v. United States*, 102 Fed. Cl. 478 (Fed. Cl. 2011) (granting in part and denying in part the defendant's motion for dismissal).

[5]There are seven Plaintiffs in Civil Action No. 08cv02584:  Sicangu Wicoti Awanyakapi Corporation; Oglala Sioux (Lakota) Housing; Turtle Mountain Housing Authority; Winnebago Housing and Development Commission; Lower Brule Housing Authority; Spirit Lake Housing Corporation, and Trenton Indian Housing Authority.

The change from the housing assistance provided under the 1937 Act to the block grant funding under NAHASDA is described in *Fort Peck I*.  The home ownership opportunities described as Mutual Help and Turnkey III are essentially lease to purchase agreements.  There are variations in the terms of these agreements which are embodied in forms provided by HUD at different times.  For present purposes these are all included in the term MHOA.

The controversy in these cases is the exclusion of MHOA units still owned or operated by the tribes from the Formula Current Assisted Stock (FCAS), the first component of the formula for determining a tribe's allotment, because HUD determined that they were no longer eligible under 24 C.F.R. § 1000.318, reading in relevant part as follows:

(a) Mutual Help and Turnkey III units shall no longer be considered Formula Current Assisted Stock when the Indian tribe, TDHE [Tribally Designated Housing Entity], or IHA [Indian Housing Authority] no longer has the legal right to own, operate, or maintain the unit, whether such right is lost by conveyance, demolition, or otherwise provided that:

(1) Conveyance of each Mutual Help or Turnkey III unit occurs as soon as practicable after a unit becomes eligible for conveyance by the terms of the MHOA and

(2) The Indian tribe, TDHE, or IHA actively enforce strict compliance by the homebuyer with the terms and conditions of the MHOA including the requirements for full and timely payment.

(b) Rental units shall continue to be included for formula purposes as long as they continue to be operated as low income rental units by the Indian tribe, TDHE, or IHA.

(c) Expired contract Section 8 units shall continue as rental units and be included in the formula as long as they are operated as low income rental units as included in the Indian tribe's or TDHE's Formula Response Form.

24 C.F.R. § 1000.318(a).

HUD initiates the annual allocation process by sending Formula Response Forms to the tribes to report changes in their FCAS.  HUD's direction to the tribes is contained in Guidance 98-19, issued in 1998.  The Guidance instructed that:

> ... The tribe/TDHE shall not include units that have been conveyed, demolished, or otherwise lost in a year prior to the fiscal year that the Formula Response Form reports. The tribe/TDHE shall not include units that have been paid-off but not conveyed unless the tribe/TDHE can demonstrate that reasons beyond the tribe/TDHE or IHA's control have not made conveyance practical. The tribe/TDHE or IHA must demonstrate that the tribe/TDHE or IHA has actively enforced strict compliance by the homebuyers with the terms and conditions of the [Mutual Help and Occupancy Agreement], including the requirements for full and timely payment. Because promissory notes can be issued, Tenant account receivables alone are not adequate for non-conveyances.

(Pls.' RA 4).

HUD also directed that for purposes of the IHBG formula, units that were converted from Mutual Help to low rent units on or after October 1, 1997, should be counted as the type of unit specified on the original Annual Contributions Contract. (*Id.* at THRHA000101).

Guidance 98-19 also informed the Tribes that if HUD discovered a tribe had received formula funds for FCAS units they did not have in management during that fiscal year, HUD would:

- Notify the tribe/TDHE of this information.
- Inform the tribe/TDHE that HUD will recoup these funds by adjusting the upcoming fiscal year's grant.
- Provide the tribe/TDHE with the opportunity to present additional information regarding the status of the units for HUD's consideration.
- Distribute any recouped funds through the formula mechanism in the upcoming fiscal year.

(*Id.* at THRHA000102).

Accepting that the pre-amendment language in § 4152(b) did not require HUD to use the 1997 units as a funding floor in the FCAS, the issue to be addressed is when does the tribe lose

the legal right to own, operate or maintain a MHOA unit?  HUD answers that question simplistically, saying that it is at the expiration of the term provided for payment in the MHOA, generally 25 years, even if the occupant has not made payment or is otherwise in default of the contract.  That is what is required by Guidance 98-19.

That directive is an arbitrary and capricious exercise of HUD's regulatory authority and is contrary to law.

The legal right to own, operate or maintain a MHOA unit is measured by the terms of the contract between the tribe and the occupant of the unit.  There are at least four variations of the forms for those contracts, provided by HUD, and, as in all contract matters, their provisions must be interpreted within the context of their performance.[6]  HUD has usurped the right of the tribe to determine how to enforce the contract and when the property should be conveyed.

HUD has disregarded the fact that the homebuyer has contract rights under the MHOA. They include the opportunity to request a repayment schedule for a delinquent balance for up to three years and the right to respond to a notice of termination with a right to hearing and consideration under state, local or tribal law as applicable in the location of the property. *See, e.g.* 1993 Form § 10.5(h) and §12.2.

The briefing and the administrative record reveal multiple scenarios which make HUD's categorical exclusions of MHOA units arbitrary and capricious.

---

[6]Plaintiffs' Non-Record Appendix (NRA) Exhibit 20 is a compilation of four versions of HUD's MHOA form: (1) Form HUD-53044 dated July 1967; (2) Form HUD-53056 dated March 1976; (3) revised Form HUD-53056 for "all Mutual Help Projects placed under ACC on or after October 1, 1990," and revised Form HUD-53056 for "all Mutual Help Projects placed under ACC on or after October 1, 1992."

**The Exclusion Of Units That Were Not Conveyed Because Federally-Funded Repair Or Modernization Work Was Being Conducted When The Units Were Otherwise Eligible For Conveyance**

When HUD reviewed the Plaintiffs' FCAS inventories, it eliminated units that tribes had not conveyed at the end of the 25-year period because the units were undergoing rehabilitation. HUD's policy was that such units are "conveyance-eligible" and thus ineligible for FCAS funding. (*See, e.g.,* Pls.' RA 13). The Plaintiffs assert that in many cases homebuyers refused to accept conveyance until modernization work was complete, and under those circumstances HUD's elimination of FCAS funding for such units was arbitrary, capricious and unlawful.

**HUD's Counting Policy Regarding Units Converted From Homeownership Units To Rental Units**

Under the IHBG formula, tribes receive higher funding for rental units than for homeownership units. In Guidance 98-19, HUD stated that units that were converted from Mutual Help to low rent units on or after October 1, 1997, must be counted as the type of unit specified on the original Annual Contributions Contract. The practical effect of this policy inhibits tribes from making those conversions.

**The Exclusion Of Units Occupied By New Tenants/Homebuyers**

When a Mutual Help unit is occupied by a new tenant/homebuyer during the initial contract term, the tribe has the legal right to establish a new purchase price and a new contract. In some cases, HUD determined that a unit was eligible for conveyance (and thus ineligible for FCAS funding) based on the original 25-year period, even though the original agreement had been replaced by a new contract with a new homebuyer.

**The Exclusion Of Demolished Units That Were Scheduled For Replacement**

Before the 2008 Reauthorization Act, HUD's policy was to eliminate demolished units

from FCAS, unless some part of the original structure remained intact. The amended version of
25 U.S.C. § 4152(b)(1) provides that if a unit is demolished and the recipient rebuilds the unit
within 1 year of demolition of the unit, the unit may continue to be included in FCAS.  That
statutory change in itself demonstrates that HUD's prior policy of eliminating units that were
demolished and scheduled for replacement was arbitrary and capricious.

### The Exclusion of Units That Were Not Conveyed Due To Title Impediments

Some tribes (most notably, Nambe Pueblo) encountered difficulties in conveying units to
homebuyers due to title impediments and delays attributable to the Bureau of Indian Affairs
("BIA"). HUD nevertheless determined that such units should be eliminated from the tribe's
FCAS, based on HUD's assessment that the tribe had not made sufficient efforts to convey the
units. These exclusions were arbitrary, capricious and unlawful.

These examples of the effects of HUD's following Guidance 98-19 lead to the conclusion
that it is invalid as contrary to NAHASDA.  A fundamental premise of NAHASDA is that
federal assistance for affordable housing to Indian tribes "shall be provided in a manner that
recognizes the right of Indian self-determination and tribal self-governance." 25 U.S.C.
§ 4101(7). That principle requires that the tribes, rather than HUD, should determine when a
homeownership unit should be conveyed to a homebuyer who has not fulfilled the MHOA
obligations and only the tribe has the legal right to proceed with such action as may be necessary
to evict the occupant under applicable law. That procedure may involve a right to cure a
delinquency and a substantial period of delay.

While the statutory and regulatory formula is to be followed, it is fundamental that the
tribe have latitude in determining the need for subsidized housing among its people.  Ultimately

that is a subjective evaluation of human factors that must be considered.  Is the tribe obligated to disregard illness, disability, unemployment, dysfunctional families and other economic stressors in assessing human needs?  The existence of a formula for determining the totality of the need for federal housing assistance funding does not justify HUD's formulaic approach to the tribe's decision to abstain from exercising judgment as to eviction of a family from a MHOA residence upon a delinquency in payment.

There is no reason to give any deference to HUD with respect to Guidance 98-19. It is not a rule established under the rule making procedure required by NAHSDA and the APA.

It is not necessary to invalidate 24 C.F.R. § 1000.318 itself as unauthorized by § 4152(b) before the enactment of the 2008 amendments to find that HUD's application of it to the plaintiff tribes now under judicial review was arbitrary and capricious.

HUD failed to comply with the statutory requirement for a hearing provided by the pre-amendment version of 25 U.S.C. § 4161(a)(1), reading in relevant part:

> . . . if the Secretary finds *after reasonable notice and opportunity for hearing that a recipient of assistance under this chapter has failed to comply substantially with any provision of this chapter*, the Secretary shall–
>
> (A) terminate payments under this chapter to the recipient;
> (B) reduce payments under this chapter to the recipient by an amount equal to the amount of such payments that were not expended in accordance with this chapter;
> (C) limit the availability of payments under this chapter to programs, projects, or activities not affected by such failure to comply; or
> (D) in the case of [noncompliance because of technical incapacity], provide a replacement tribally designated housing entity for the recipient, under section 4162 of this title.

(emphasis added).

HUD's authority to review and audit the tribes' grant applications is in 25 U.S.C. § 4165.

Under §4165(d) the Secretary's authority to adjust the amount of a grant based on the findings

made in those audit reports is expressly made subject to the hearing in section 4161(a).  HUD

has recognized that limitation in its regulation at 24 C.F.R. § 100.532:

> (a) HUD may, subject to the procedures in paragraph (b) below, make appropriate adjustments in the amount of the annual grants under NAHASDA in accordance with the findings of HUD pursuant to reviews and audits under section 405 of NAHASDA. HUD may adjust, reduce, or withdraw grant amounts, or take other action as appropriate in accordance with the reviews and audits, except that grant amounts already expended on affordable housing activities may not be recaptured or deducted from future assistance provided on behalf of an Indian tribe.

> (b) Before undertaking any action in accordance with paragraphs (a) and (c) of this section, HUD will notify the recipient in writing of the actions it intends to take and provide the recipient an opportunity for an informal meeting to resolve the deficiency. In the event the deficiency is not resolved, HUD may take any of the actions available under paragraphs (a) and (c) of this section. However, the recipient may request, within 30 days of notice of the action, a hearing in accordance with § 1000.540. The amount in question shall not be reallocated under the provisions of § 1000.536, until 15 days after the hearing has been held and HUD has rendered a final decision.

> (c) Absent circumstances beyond the recipient's control, when a recipient is not complying significantly with a major activity of its IHP [Indian Housing Plan], HUD shall make appropriate adjustment, reduction, or withdrawal of some or all of the recipient's subsequent year grant in accordance with this section.

These provisions are applicable to the HUD actions now under review.[7]  That legal

conclusion is supported by the action of Congress in adding the following paragraph to §

4161(a) in the 2008 amendments:

> (2) Substantial noncompliance
> The failure of a recipient to comply with the requirements of section 4152(b)(1) of this title regarding the reporting of low-income dwelling units shall not, in

---

[7]Because *Nambe Pueble Housing Authority v. HUD*, Civil Action No. 11-cv-01516-RPM, was filed after the deadline set forth in the Reauthorization Act, that action presents some unique issues which were the subject of separate briefing and are addressed in a separate opinion and order.

-12-

itself, be considered to be substantial noncompliance for purposes of this
subchapter.

25 U.S.C. § 4161(a)(2)(2008).

The Reauthorization Act of 2008 was a substantive change in the statutory framework.  It
cannot be read as a clarification of pre-existing law and it cannot be given retroactive effect to
these disputes.

HUD has asserted the statute of limitations in 28 U.S.C. § 2501 bars some of the claims
now under review.  The plaintiffs' argument that the savings clause in § 42152(b)(1)(E) creates
an exception is rejected as it was by the Court of Federal Claims in *Lummi Tribe v. United
States*, 99 Fed. Cl. 584, 606-07 (Fed. Cl. 2011).  The factual question of when the statute began
to run is reserved for the next phase of this litigation.

The legal conclusions made in this case will be adopted by reference in orders to be
entered in all of the other cases pending in this court and will guide the mixed questions of fact
and law remaining to be adjudicated pursuant to a procedure to be determined at another
coordinated scheduling conference.

SO ORDERED.

Dated: August 31, 2012

BY THE COURT:

s/ Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge

-13-